AO 91 (Rev. 11/11)  Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT

**7/10/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CDO _____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT

JUL 1 0 2024

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| GUANRONG CHEN | )  Case No. |
| | )  2:24-mj-04107-DUTY |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____ 2018 and July 9, 2024 _____ in the county of _____ LOS ANGELES _____ in the
_____ CENTRAL _____ District of _____ CALIFORNIA _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 846 | Conspiracy to distribute controlled substances |
| 21 USC 841(a)(1), (b)(1)(A), (D) | Possession with intent to distribute controlled substances |
| 18 USC 1956(h) | Conspiracy to launder monetary instruments |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

/s/

_____
*Complainant's signature*

Fahd Farouh, Special Agent, Homeland Security Inv
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 10, 2024

_____
*Judge's signature*

City and state: Los Angeles, CA

Michael R. Wilner, U.S. Magistrate Judge
*Printed name and title*

'USA: Julie J. Shemitz

## **AFFIDAVIT**

I, Fahd Farouh, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.    I am a Law Enforcement Officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.    I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), and I have so been so employed since March 2023.  I am currently assigned to the office of the Assistant Special Agent in Charge, Riverside ("ASAC Riverside") where I am assigned to the Narcotics Group and serve as a Task Force Officer (TFO) with the Inland Narcotics Crackdown Allied (INCA) Task Force. I completed the Federal Law Enforcement Training Center Criminal Investigator Training Program in Glynco, Georgia, in August 2023, and the HSI SA Training Program in December 2023. I have received extensive training in the areas of investigations with emphasis on laws and regulations, arrest procedures, execution of searches and seizures, and various other topics.

3.    As a SA, I have interviewed witnesses in connection with several types of investigations, to include drug related investigations. Additionally, I have participated in the execution of search and arrest warrants involving drug trafficking crimes. Through my training, experience, and

interaction with more experienced Special Agents, TFOs, and other investigators, I have become familiar with the methods employed by drug traffickers, in particular, practices to smuggle, store, transport, and distribute drugs, and to collect and launder drug-related proceeds. These methods include the use of wireless communications (such as cell phones) to both send text messages and to make voice calls related to smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded or encrypted communications, in an attempt to avoid detection by law enforcement and to circumvent drug investigations. Based on my training and experience, I know that persons involved in the illicit distribution of controlled substances commonly attempt to conceal their identities, as well as the locations at which drug transactions take place. They are also known to have vehicles, properties, utilities, and other purchases under fictitious names and/or in the names of other individuals to conceal their criminal activities and financial transactions. I am aware that persons engaged in organized drug distribution and sales maintain contact with individuals from whom they receive and/or to whom they distribute drugs. I know for this to be done effectively, these persons and organizations maintain continued access to electronic communication, including both voice and text communications.

4.    Prior to my present assignment, I was employed as a Document and Media Exploitation Analyst in support of the US Drug Enforcement Administration ("DEA"). I assisted on numerous drug investigations and have become aware of the many techniques

often employed by drug trafficking organizations to minimize their direct involvement in sophisticated schemes for legitimizing illicitly gained proceeds. I have participated in investigations focused on drug distribution, firearms violations, and laundering of proceeds derived from controlled substances and other specified unlawful activities, and conspiracies to commit the same. I have assisted on financial investigations during which I contributed to identifying evidence of financial abnormalities consistent with money laundering and structuring. Additionally, I have served in the United States Army Reserves as an Intelligence Analyst. My job duties included but were not limited to analysis of intelligence acquired from Human Intelligence (HUMINT), Signal Intelligence (SIGINT), and Open-Source Intelligence (OSINT).

## II. **PURPOSE OF AFFIDAVIT**

5.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, Guanrong CHEN for violations of 21 U.S.C. § 846: Conspiracy to Distribute methamphetamine and marijuana; 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i),(ii), (b)(1)(b)(viii), (b)(1)(B)(ii), and (b)(1)(D): Possession with Intent to Distribute methamphetamine and marijuana; and 18 U.S.C. § 1956(h): Conspiracy to Launder Monetary Instruments.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, and
warrant and does not purport to set forth all my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

### III.  STATEMENT OF PROBABLE CAUSE

7.    In early 2016, HSI Riverside's Narcotics group
initiated a joint investigation with the Rialto Police
Department ("RPD"), the Inland Crackdown Allied Task Force
("INCA"), and the Internal Revenue Service ("IRS") into what was
then known as the WU Money Laundering/Drug Trafficking
Organization (ML/DTO), along with the suspected head, Zepei WU,
associate Manuel Bolanos, Miriam Wu, and Li Chin Lee. This joint
investigation targeted a transnational criminal organization
(TCO) involved in laundering large quantities of domestic and
foreign currency, which were identified as proceeds of illegal
activity including the sale and distribution of narcotics.

8.    Using an HSI-documented confidential informant ("CI"),
HSI Riverside successfully introduced an undercover law
enforcement agent ("UC1") into the organization who portrayed
himself as the head of operations for an unnamed drug
trafficking organization in North America. During early meetings
with the organization, there were discussions regarding the
purchase, sale, and distribution of narcotics, as well as the
eventual laundering of the proceeds through U.S. financial
institutions.

9.      During subsequent meetings between BOLANOS and UC1, discussions were held regarding the shipment of large quantities of narcotics to Australia. Bolanos advised he had a contact he referred to as "the Chinese," who was seeking to have approximately 200 to 250 kilograms of methamphetamine shipped to Sydney, Australia.  Bolanos arranged subsequent meetings between UC1 and "the Chinese" to further discuss the arrangements for the shipment.

10.     On October 17, 2023, investigators conducted an undercover meeting with Bolanos in the city of West Covina, CA. An audio recording of this meeting was captured by the CI at the direction of Special Agent Alnahl Jones and is maintained by him in the case file. During the meeting, UC1 was able to confirm that Bolanos is currently working with an individual who is a Chinese national. Bolanos requested the CI and UC1 to meet with a local group of Chinese nationals in the Los Angeles area who want to purchase large quantities of narcotics and have them shipped to Australia.

11.     On February 6, 2024, investigators conducted a meeting with Bolanos in the city of West Covina, CA.  An audio recording of this meeting was captured by the CI and UC1 at the direction of SA Jones via a recorded line on the CI cell phone. The audio recording was archived and is maintained electronically by SA Jones. During this meeting, Bolanos discussed plans for the delivery of approximately 150 to 250 kilograms of methamphetamine to Sydney, Australia. Bolanos relayed that a "Big Boss" (a Chinese national) in San Franciso, was ready to

commit to the order, and relayed that there were three additional "Big Bosses" in Australia in different cities, who needed the shipment as soon as possible. Bolanos discussed payment for the shipment of anywhere between $28,000 to $35,000 USD per kilogram. A secondary meeting was planned for a later date for UC1 to meet in person the Chinese "Big Boss" from San Francisco.

12.   On February 21, 2024, a grand jury for the Central District of California in Los Angeles returned a six-count indictment based upon the investigation to that date charging Zepei Wu, Bolanos,  Miriam Wu, and Lee with conspiracy to distribute heroin, cocaine, and methamphetamine, in violation of 21 U.S.C. § 846; possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A); conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h), money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); conspiracy to operate an unlicensed money transmitting business in violation of 18 U.S.C. § 371; and operating an unlicensed money transmitting business in violation of 18 U.S.C. §§ 1960(a), (b)(1)(A), (C).

13.   Bolanos arranged a meeting between the CI, UC1, and two Chinese adult males.  One Chinese adult male was later positively identified as Guanrong CHEN, the second individual was later positively identified as Guangdan Shi. Bolanos provided the CI with phone number 626-267-3477 to contact CHEN, referred to by Bolanos as "the Chinese" to arrange a meeting to discuss the movement of narcotics to Australia. Bolanos was not

physically present for the meeting, but he served as the point of contact for CHEN, Shi, and the CI.

14.   On May 7, 2024, the CI and UC1 met with CHEN and Shi in the city of West Covina, California, to discuss arrangements for the shipment of approximately 200 kilograms of methamphetamine to Australia. CHEN contacted the CI from phone number 626-267-3477 to indicate he had arrived at the predetermined meeting location, a BJ's Restaurant in West Covina, California. An audio recording of this meeting was successfully captured by the CI under the direction of SA Jones. The CI utilized a recorded line monitored via his cell phone. The recording is archived electronically and is maintained in the case file by SA Jones.

15.   CHEN arrived at the meeting location and stated he was waiting for his partner, Shi.  Subsequently, Shi arrived at the meeting location, and met with CHEN, the CI and UC1. Shi introduced himself as "Danny," and was the primary speaker during the negotiations. During the meeting, Shi stated "they" were ready to make the deal happen. Shi agreed to the delivery of approximately 200 kilograms of methamphetamine to Sydney, Australia for a price of $25,000 to $30,000 USD per kilogram. Once the meeting ended, Shi provided his phone number as 626-724-4477 for future contact with UC1 and the CI. Shi indicated he would contact UC1 at a later date to further discuss arrangements for the transaction.

16.   On May 16, 2024, the CI and UC1 met with CHEN and Shi at a Buffalo Wild Wings restaurant in Montclair, CA. An audio

and video recording of this meeting was successfully captured by UC1 under the direction of SA Jones using a covert audio/video recording device. The recording was downloaded from the device via a CD and was placed into the case file maintained by SA Jones.

17.   Shi arrived at the meeting location at approximately 12:00 p.m. driving a black Porsche Cayenne bearing CA plate 9GJW643. Shi stated he was waiting for his partner to arrive. A short time later, Guanrong CHEN arrived and was observed driving a Hyundai Sonata bearing CA plate 6RVK669.

18.   UC1 asked Shi if the payment would be made here in the U.S. simultaneously as the methamphetamine was delivered to Australia, and Shi advised yes, they would make half payment in USD cash, and the other half in USDT cryptocurrency ("Tether"). Shi advised UC1 the current price he was willing to pay for the narcotics was $28,000 to $35,000 per kilo (for a total of approximately $5.6 to $6.4 million USD). Shi advised he would try to get it all paid in USD cash. At this point, in order to demonstrate good faith, UC1 telephoned a second undercover agent posing as an individual working for UC1 ("UC2") to conduct a "drive-by" in an undercover vehicle to show the drugs to Shi and CHEN.

19.   A few moments later, UC2 arrived in an undercover vehicle and UC1 opened the rear hatch of the vehicle, displaying two suitcases containing a total of approximately 100 kilograms of methamphetamine to Shi and CHEN.  UC1 commented to Shi regarding the 200 kilograms ordered, and Shi looked at the

suitcases and immediately said, "that's 100." UC1 told Shi that
he had a load coming through the border that would arrive soon.
At this point, UC1 directed UC2 to leave the meeting.

20.  UC1 telephoned a third undercover agent also posing as
an employee of UC1 ("UC3") via FaceTime and had UC3 show Shi an
additional 100 kilograms of methamphetamine. UC1 informed Shi a
"fee" was needed upfront to "ensure delivery of the shipment" to
Sydney. (At this time, Shi had no comment on the "fee", he just
continued to listen to UC1 talk). Shi stated he wanted to
complete the deal before June 26, 2024.  Shi also stated he had
already recently shipped 500 kilograms of cocaine to Hong Kong
and had another shipment of approximately 25 to 30 kilograms of
cocaine on the way to Hong Kong and wanted to be there for the
arrival of the cocaine in Hong Kong on June 26.

21.  Shi told UC1 that after this first delivery was done
to Australia, he would like to do an additional "side deal" with
UC1 for a cheaper price. UC1 reiterated the up-front fee once
again to Shi, and Shi stated he would let UC1 know by that night
regarding the fee. The meeting ended and Shi was observed
driving away in the black Porsche Cayenne; CHEN was observed
driving away in the Hyundai Sonata.

22.  On May 25, 2024, at approximately 6:00 p.m. local
time, the UC, and Australian Federal Police ("AFP") Undercover
Operative ("UO"), met with Shi at the Star Casio Hotel in
Sydney, New South Wales, Australia. An audio recording of this
meeting was successfully captured by UC1 under the direction of
SA Jones. UC1 utilized a recorded line monitored via his cell

phone. The recording is archived electronically and is maintained in the case file by SA Jones. The AFP Undercover Operations Division captured the meeting via covert audio and video equipment installed by the AFP in the hotel room where the meeting occurred.  This audio and video recording is maintained by the AFP.

23.  During the meeting, UC1 and the AFP UO conducted a surprise flash of one kilogram of methamphetamine. Shi attempted to buy the kilogram of narcotics from the undercover operatives and kept asking how much. Shi was in contact with an unknown party in Australia via his cell phone during the meeting and was overheard speaking what appeared to be the Chinese language to the person he was in contact with on the phone.

24.  Additionally, during the meeting, Shi agreed to pay a $50,000 initiation fee for the previously requested 200 kilograms of methamphetamine to be delivered to Australia.  Shi advised the initiation fee would be paid in USD cash in Los Angeles, on June 5, 2024.  UC1 advised Shi once the initiation fee was paid, his shipment of the 200 kilograms of narcotics would be initiated with a 30-day window of delivery to Australia.

25.  Later the same day, Shi reached out to UC1 via text message and attempted to buy an additional 50 kilograms of methamphetamine from UC1 while in Australia.  wanted the 50 kilograms immediately and relayed he and his Shi partner in Australia were ready to pay cash for the 50 kilograms.

26.  UC1 and Shi agreed that, rather than paying the $50,000 "initiation fee" that was previously negotiated, instead Shi would purchase an additional 50 kilograms of methamphetamine at a cost of $1,000 each (the price in Los Angeles) for a total of $50,000.  The additional 50 kilograms would be added to the original 200 kilograms for a total of 250 kilograms to be delivered to Australia.  The original 200 kilograms of methamphetamine would be paid at the going rate in Australia upon delivery, which is approximately $28,000 to $32,000 USD for a total of $5.6 to $6.4 million.

27.  On June 7, 2024, the CI and UC1 met with Shi at a Chili's restaurant in Montclair, CA. An audio and video recording of this meeting was successfully captured by UC1 under the direction of SA Jones using a covert audio/video recording device. The recording was downloaded from the device to a CD and was placed into the case file maintained by SA Jones.

28.  Shi arrived at the meeting location at approximately 11:20 a.m. driving a Lexus sedan bearing CA plate 8EUT479. During the meeting, Shi gave UC1 approximately $40,000 USD cash as partial payment for the requested 250 kilograms of methamphetamine to be delivered to Australia. Shi stated his partner, referencing CHEN, would be available with the additional $10,000 USD cash and would arrive to the meeting location in about an hour or more. Shi stated he was willing to pay $32,000 USD cash per kilogram for the shipment of the originally requested 200 kilograms of methamphetamine to Australia and requested to pay half USD cash and half in

cryptocurrency upon delivery of the shipment to Australia. UC1 and Shi agreed to meet at a later date to conduct a money pick up of the remaining $10,000 USD cash from the $50,000 SHI had previously promised.  The meeting ended and Shi was observed driving away in the Lexus sedan.

29.  On June 13, 2024, the CI and UC1 met with CHEN at a Chili's restaurant in Montclair, CA. An audio and video recording of this meeting was successfully captured by UC1 under the direction of SA Jones and the recording was downloaded and is maintained in the case file by SA Jones. CHEN was observed driving a blue Volvo bearing CA Plate 6DIZ362. During the meeting, CHEN gave UC1 approximately $9,950 USD cash as the remaining partial payment for the requested 250 kilograms of methamphetamine to be delivered to Australia. CHEN was observed driving away in the blue Volvo.

30.  The UC and Shi were scheduled to meet at a later date to discuss the process for delivery of the five to six million USD cash, in Los Angeles, CA in payment for the 250 kilogram methamphetamine shipment to Australia.

31.  On June 24, 2024, the CI, UC1, and UC2 met with CHEN at a Chili's restaurant in Montclair, CA. An audio and video recording of this meeting was successfully captured by UC1 under the direction of SA Jones using a covert audio/video recording device.  The recording was downloaded from the device via a CD and was placed into the case file maintained by SA Jones.

32.  On June 24, 2024, the CI, UC1, and UC2 met with CHEN at a Chili's restaurant in Montclair, CA. An audio and video

recording of this meeting was successfully captured by UC1 under the direction of SA Jones using a covert audio/video recording device.  The recording was downloaded from the device via a CD and was placed into the case file maintained by SA Jones.

33.   CHEN arrived at the meeting location at approximately 11:00 a.m. and was observed driving a blue Volvo bearing CA Plate 6DIZ362. UC1, CI and CHEN greeted one another, and UC1 introduced UC2 as "Paco."  UC1 informed CHEN that "Paco" would be the person who would be present during the next meeting to receive the USD cash to be paid for the shipment of the 250 kilograms of methamphetamine to Australia.  UC1 told CHEN to be ready to deliver the cash somewhere on or about July 8-10, 2024, and that it would most likely be the 9th of July.

34.   UC1 asked CHEN how much cash he would be bringing to the meeting, and CHEN said approximately three million USD. CHEN said he was scared to bring that much money in his car at once, and said he wanted to deliver the money in two or three separate trips. CHEN also stated to UC1 that he knows he shorted UC1 by $50 USD on the last money delivery, and then proceeded to hand UC1 $50 USD cash. UC1 asked CHEN what city he would be picking up the money from on the day of the money drop, and CHEN relayed the money would be picked up in the city of El Monte, CA.  UC1 advised CHEN the money drop would happen in a parking lot in the city of West Covina, CA, and CHEN agreed.

35.   CI asked CHEN if he had heard from "Carlos" (Bolanos), and CHEN stated he had not. UC1 instructed CHEN to send "Carlos" a message and see if he could reach him. At this time, CHEN

spoke Chinese into his phone, and then relayed he had just sent "Carlos" a message. UC1 reiterated to CHEN that he would be meeting "Paco" and the CI on the day of the money drop and no one else. UC1 advised CHEN to not bring anyone else to the meet for the money drop, and CHEN agreed. The meeting ended and CHEN was observed entering and driving away in the blue Volvo he had arrived in.

36. On July 9, 2024, at approximately 4:00 p.m., the CI provided CHEN the address of 379 E Rowland St, Covina, CA 91723 as the meeting location for the cash delivery for the methamphetamine shipment to Australia. During conversations with the undercover agents, SHI indicated CHEN would deliver the money to UC2 at the meeting location. SHI claimed the person who would deliver the cash was working and would not be available until 8:00 p.m. Pacific Time. At approximately 4:30 p.m., CHEN was observed exiting 12333 Felipe St, El Monte, CA 91732 residence, and began to remove a trash can from the curb side in front of the residence and bring it inside into the garage of the residence. CHEN was not observed departing the residence thereafter.

37. On July 9, 2024, at approximately 7:00 p.m., Special Agents with the Drug Enforcement Administration (DEA) executed a search warrant on 12333 Felipe St, El Monte, CA 91732. CHEN and another occupant, Jian Feng Chen, were the only ones present at the residence when the warrant was executed. Upon searching the residence, agents located an approximate total of 100 to 200 pounds of suspected marijuana spread out in various locations on

the first floor of the residence. Approximately 10 to 20 pounds of the suspected marijuana was found in the dining room, approximately 10 to 20 pounds was found in the living room, and the rest was found in large trash bags in another room on the first floor that appeared to be a storage area for the bulk of the suspected marijuana as there were no beds or any identifying documents present within the room.

38.   In CHEN's suspected bedroom on the second floor agents located two small transparent baggies, or "dime baggies," of a white powdery substance suspected to be cocaine or ketamine. In this room agents also located CHEN's Chinese passport as well as other identification cards, a credit card, and prescription medication all in CHEN's name.

## IV. CONCLUSION

39.   For all the reasons described above, there is probable cause to believe that CHEN has committed violations of 21 U.S.C. § 846: Conspiracy to Distribute methamphetamine; 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), (b)(1)(b)(viii), and (b)(1)(B)(ii), and (b)(1)(D) Possession with Intent to

//

//

//

//

//

//

//

//

Distribute methamphetamine and marijuana; and 18 U.S.C.

§ 1956(h): Conspiracy to Launder Monetary Instruments.

/s/

_____
Fahd Farouh, Special Agent
Homeland Security Investigations

**TELEPHONIC VERSION:**
Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __10__ day of
July, 2024.

_____
HONORABLE ~~MARGARET A. ROCCONI~~ michael R. wilner
UNITED STATES MAGISTRATE JUDGE